UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

William Ray Costello,           :
          Plaintiff,            :
                                :
          v.                    :     File No. 1:07-CV-165
                                :
City of Burlington,             :
Burlington Police Department,   :
Gene Burgman, Tom Trembly,      :
Bill Ward, John Lewis,          :
          Defendants.           :

OPINION AND ORDER
(Doc. 25)

Plaintiff William Ray Costello, proceeding *pro se*, brings
this action claiming that the defendants interfered with his
First Amendment right to preach in a public place.  In June
2007, he was twice approached by police while preaching loudly
on Church Street in downtown Burlington.  On the first
occasion, he was informed that he needed a permit.  On the
second, he was issued a written warning for violating the
City's noise ordinance.  Costello submits that these actions
violated his constitutional rights.

The Court previously considered Costello's claims and
issued a judgment in favor of the defendants.  Costello
appealed the Court's ruling to the United States Court of
Appeals for the Second Circuit.  On appeal, the Second Circuit
remanded the case "to supplement the record regarding the
activities and noise level that are 'usual and customary' in
the space where the alleged violation occurred."  (Doc. 44 at

3).  On remand, the parties have filed supplemental briefs and factual statements.  Having reviewed these submissions, the Court finds that the defendants are entitled to judgment as a matter of law.

Factual Background

Costello alleges in his complaint that on June 23, 2007, he was "lawfully Preaching the Gospel of Jesus Christ" on Church Street, a pedestrian street in Burlington, Vermont, when he was approached by a Burlington police officer.  The officer allegedly informed Costello that he needed a permit to continue preaching.  Costello objected and said that he would be contacting the officer's supervisor.  On June 27, 2007, Costello wrote to Police Chief Trembly and Lieutenant Ward and "informed the police it was my Right under the First Amendment to [preach] the Gospel."

Costello claims that on June 30, 2007, he again tried to preach on Church Street.  Sergeant John Lewis allegedly approached him and told him that if he continued preaching he could receive a ticket for violating the Burlington noise ordinance.  Sergeant Lewis also gave Costello a written warning.  Costello again objected and informed Sergeant Lewis that he would pursue his legal remedies.  (Doc. 1 at 1-2).

At summary judgment, Sergeant Lewis has presented an affidavit stating that he responded to a call from a local

2

merchant complaining that Costello was causing a disturbance on Church Street. When Sergeant Lewis approached the scene, he could hear Costello "from almost a block away." (Doc. 25-2 at 2). He subsequently spoke with Costello, informed him that Burlington's noise ordinance prohibited him from speaking so loudly, and issued him a warning. Lewis testifies that he did not tell Costello to stop preaching, and that he instead asked him to keep his voice at a reasonable level. Id.

In response to the summary judgment motion, Costello admits that he was speaking loudly. "Most preachers," he explains, "are also callers liken to the police callers in England stating all is well clanging a bell or the peddler caller selling his wares, or the women selling roses." He concludes that these examples "proclaim it common and ordinary to say and do loud things because that is what people have always done." (Doc. 32 at 8-9).

In its prior order on Sergeant Lewis's summary judgment motion, the Court found that Costello "appears to be bringing both a facial challenge to the statute and an 'as applied' challenge to its enforcement." (Doc. 37 at 10). The Court proceeded to uphold the constitutionality of the ordinance on its face, noting that the Burlington noise ordinance had survived a previous vagueness challenge. Id. at 11; see Howard Opera House Assocs. v. Urban Outfitters, 322 F.3d

125, 128 (2d Cir. 2003). The Court also granted summary judgment to Sergeant Lewis on the "as applied" challenge, holding that he was entitled to qualified immunity for his actions. (Doc. 37 at 12-13).

The Second Circuit affirmed the Court's ruling on the facial challenge. (Doc. 44 at 2). With respect to the "as applied" challenge, the Second Circuit remanded for supplementation of the record.

> To assess the District Court's grant of summary judgment on this issue, we must consider whether Burlington's ordinance was applied to Costello in a manner that was "narrowly tailored to serve a significant governmental interest." <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989). As we explained in [<u>Deegan v. City of Ithaca</u>, 444 F.3d 135, 140 (2d Cir. 2006)], narrow tailoring is "fact specific and situation specific," which, in the case of a restriction on "unreasonable noise," requires an inquiry into the character and environment of the area in which the ordinance was enforced; it matters whether it is a parking lot, a stadium, or a residential street. In short, the inquiry looks to the level of noise that is "usual and customary in a particular setting." 444 F.3d at 141-43.
>
> We REMAND to the District Court to supplement the record regarding the activities and noise level that are "usual and customary" in the space where the alleged violation occurred. The District Court should then determine, in light of that record, whether Defendants were entitled to judgment as a matter of law.

<u>Costello v. City of Burlington</u>, 329 Fed. Appx. 330 (2d Cir. 2009).

On remand, the parties have submitted additional memoranda and Sergeant Lewis has filed a supplemental

4

affidavit and statement of undisputed facts.  Lewis's
affidavit, which is largely undisputed, explains that Church
Street is a four-block, brick-paved pedestrian street.  The
north end of Church Street begins at Pearl Street, and heading
south is crossed by Cherry Street, Bank Street and College
Street.  The pedestrian portion of Church Street ends at Main
Street.

Vehicles are not allowed on Church Street except where
there are cross streets.  "Vehicles do traverse the cross
streets, but yield to the many pedestrians on Church Street,
and necessarily crawl through the intersections."
Consequently, "[t]raffic noise on Church Street is negligible
– particularly in the middle blocks removed from the northern
and southern ends of the pedestrian street."  (Doc. 46-2 at
2).

Church Street is lined primarily with retail shops and
restaurants.  In the warmer months, some of the restaurants
have outdoor seating.  Church Street also has residential
apartments on the upper floors.  Id.

Sergeant Lewis summarizes the atmosphere on Church Street
as follows:

> Typically – and particularly when the temperature is
> warm – the street is full of shoppers and others who
> enjoy the relaxed atmosphere, and frequent the many
> outdoor restaurants and cafes.  The most significant
> concentration of outdoor restaurant seating is
> located between Bank and Main Streets, and the

> majority of pedestrians congregate in the middle two
> blocks – between Cherry and College Streets.
>
> Benches and rock formations are also scattered along
> Church Street, and many onlookers simply observe the
> passing activity.  In addition, musicians often play
> acoustic instruments for donations on Church Street,
> and are typically spread out to ensure they do not
> compete with one another to be heard.  Individuals
> also commonly operate retail kiosks, and have
> commercial and political tables on Church Street.
> In sum, Church Street is a family-friendly
> pedestrian mall, which is inviting to many, and is
> used by a wide assortment of people in a variety of
> ways.

Id. at 2-3.  Lewis further characterizes Church Street as

"typically quite tranquil," and a place where "[p]eople can

walk and talk, or enjoy an outdoor meal, without having to

raise their voices to be heard."  Id. at 3.

In his initial affidavit, Sergeant Lewis testified that

as he approached the intersection of Church and Bank Streets,

he could hear Costello "yelling from almost a block away."

(Doc. 25-2 at 2).  Costello was standing in front of Lippa's

Jewelers, which is located on the east side of Church Street,

two stores north of College Street and nearly an entire block

south of Bank Street.  (Doc. 46-2 at 3).  In supplementing the

record, the defendants submit that the distance between the

front of Lippa's Jewelers and the building on the corner of

Church and Bank Streets is approximately 350 feet.  (Doc. 46-

5) (Aff. of Corporal Paul B. Fabiani).

6

The block between College and Bank Streets is home to
seven eateries with outdoor tables.  Lewis approximates that
the seating capacity for those eateries is approximately 220
people.  (Doc. 46-2 at 3).  In addition, in the block to the
south of where Costello was standing, there are additional
eateries with seating for approximately 325 people.  Id.
While Sergeant Lewis does not recall precisely how many people
were in the vicinity while Costello was preaching, the
defendants have submitted photographs of what Lewis claims are
"a reasonable depiction of how Church Street appeared when
Plaintiff preached on June 30, 2007."  Id. (referencing Doc.
46-4 at 1-4).  Those photographs show a kiosk and park benches
in the vicinity of Lippa's Jewelers, open restaurant seating
immediately across Church Street, and pedestrians, including
young families, occupying the center portion of the street.
Id.

Lewis attests that as he approached Church Street that
Saturday morning, Costello's "voice was louder than all other
sounds, and his voice was readily distinguishable . . . .
Many other people were also on Church Street, but no one else
was yelling, and no other single noise – or combination of
noises – stood out or dominated the marketplace like
[Costello's] voice."  Id. at 5-6.  Costello's preaching
continued while Sergeant Lewis made his way from Bank Street

7

to the front of Lippa's Jewelers, his voice growing "increasingly louder" as Lewis approached. Id. at 5. Lewis, a 22-year veteran of the Burlington Police Department, testifies that Costello's volume was "not typical, usual, or customary" for that location, and that he believed the yelling was disruptive for other people using Church Street. Id. at 6. He reiterates in his supplemental affidavit that he did not ask Costello to stop preaching, but merely "to lower his voice if he wanted to deliver his message on Church Street . . . ." Id.

While Costello does not challenge Sergeant Lewis's depiction of Church Street, he notes in response that there are loud events that take place there during the year. As examples, Costello cites a jazz festival held for one week in June, a public ceremony featuring Senator Patrick Leahy and Burlington Mayor Bob Kiss, a "Zombie walk" and an "annual pillow fight." He has also submitted a list of events that took place on Church Street in 2009. (Doc. 47-1). Based upon these examples, he argues that Church Street is "used for recreation, celebration, commerce, [d]emonstrations, rallies, music, speeches and events. Therefore, it is usual and customary that loud noise[s] [a]re heard on Church Street." (Doc. 47 at 2).

In reply, the defendants have submitted an affidavit from Walter Decker, Administrative Deputy Chief of the Burlington Police Department. Deputy Chief Decker states that the annual jazz festival obtains "many permits from the City, and is subject to the attendant uses and restrictions." (Doc. 48-1 at 2). Similarly, the event with Senator Leahy and Mayor Kiss was organized and authorized by a City official. Other events, such as "rallies or speak outs" require permits, while the "Zombie walk" and "pillow fight" are not authorized events and are subject to prosecution if they violate the noise ordinance. In fact, "[m]erchants voiced their disapproval of the 'Pillow Fight,' and police were called last year, intervened, and initially cited an instigator." Id. at 2.

Events that are either conducted or permitted by the City are exempt from the noise ordinance. (Doc. 25-3) (Burlington Code, § 21-13(c)(5)).

## Discussion

I.  Summary Judgment Standard

As the Court noted in its previous order, summary judgment should be granted only when there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that there is no genuine issue

of material fact.  See Marvel Characters, Inc. v. Simon, 310

F.3d 280, 286 (2d Cir. 2002); Goenaga v. March of Dimes Birth

Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (stating that

movant may meet burden by "point[ing] to an absence of

evidence to support an essential element of the nonmoving

party's claim.").  Once the movant satisfies this burden, the

non-moving party must respond by setting forth "specific facts

showing that there is a genuine issue for trial."  Fed. R.

Civ. P. 56(e).  In determining whether summary judgment is

appropriate, a court must "construe the facts in the light

most favorable to the non-moving party and must resolve all

ambiguities and draw all reasonable inferences against the

movant."  Williams v. R. H. Donnelley, Corp., 368 F.3d 123,

126 (2d Cir. 2004).

II.  First Amendment Claim

    A.  General Considerations

    The United States Supreme Court has made clear that

members of the public "retain strong free speech rights when

they venture into public streets and parks, which have

immemorially been held in trust for the use of the public and,

time out of mind, have been used for purposes of assembly,

communicating thoughts between citizens, and discussing public

questions."  Pleasant Grove City, Utah v. Summum, 129 S. Ct.

1125, 1132 (2009 (citations and internal quotation marks

omitted).  Moreover, religious speech is specifically
protected under the First Amendment.  <u>Deegan</u>, 444 F.3d at 141.

Even in a public forum, however, "the government may
impose reasonable restrictions on the time, place, or manner
of protected speech."  <u>Ward</u>, 491 U.S. at 791.  As the Supreme
Court explained in <u>Ward</u>, those restrictions must be (1)
content neutral, in that they target some quality other than
substantive expression; (2) narrowly tailored to serve a
significant governmental interest; and (3) permit alternative
channels for expression.  <u>Id.</u>  "This standard is commonly
referred to as intermediate scrutiny."  <u>Deegan</u>, 444 F.3d at
142 (citing <u>Mastrovincenzo v. City of New York</u>, 435 F.3d 78,
98 (2d Cir. 2006)).

The burden of showing that a restriction of speech is
justified lies with the government.  <u>Deegan</u>, 444 F.3d at 142
(citing <u>United States v. Doe</u>, 968 F.2d 86, 90 (D.C. Cir.
1992)).  In this case, as in <u>Deegan</u>, there is no question that
application of the ordinance was content neutral, as it
targeted the volume rather than the substantive content of
Costello's speech.  The initial focus, therefore, is on
whether application of noise ordinance was narrowly tailored
to serve a legitimate governmental interest.  <u>Id.</u>

With regard to a governmental interest, the Second
Circuit has allowed that "[t]he elimination of excessive noise

is a substantial and laudable goal." <u>Carew-Reid v. Metro.</u>
<u>Transp. Auth.</u>, 903 F.2d 914, 917 (2d Cir. 1990).  Nonetheless,
enforcement of the City's ordinance "must avoid unnecessary
intrusion on [the plaintiff's] freedom of expression."
<u>Deegan</u>, 444 F.3d at 143 (citing <u>Ward</u>, 491 U.S. at 788-89).

    B.   <u>"Usual and Customary"</u>

The City of Burlington's noise control ordinance states
its purpose as follows:

> The purpose of this section is to preserve the
> public health, safety, and welfare by prohibiting
> excessive and disturbing noise and to prevent noise
> which is prolonged or unsuitable for the time and
> place and which is detrimental to the peace and good
> order of the community.  It is the goal of this
> section to allow all residents of our city to
> peacefully coexist in a manner which is mutually
> respectful of the interests and rights of others.

(Doc. 25-3 at 1).  The ordinance goes on to prohibit noise
that is "loud or unreasonable . . . .  Noise shall be deemed
to be unreasonable when it disturbs, injures or endangers the
peace or health of another or when it endangers the health,
safety or welfare of the community."  <u>Id.</u>

Sergeant Lewis interpreted "unreasonable" noise as
shouting that could be heard at least 350 feet away.  The
Second Circuit has asked that the record be supplemented in
order to determine whether the speech in question was of a
volume that "exceeds what is usual and customary in a
particular setting."  (Doc. 44 at 3) (quoting <u>Deegan</u>, 444 F.3d

at 141-43).  This "requires an inquiry into the character and environment of the area in which the ordinance was enforced."  Id.

The forum in question was Church Street, a pedestrian section of Burlington that is primarily home to retail shops and restaurants.  The undisputed record indicates that Church Street is a vibrant place, often filled with shoppers and restaurant-goers "who enjoy the relaxed atmosphere."  (Doc. 46-2 at 2).  It is also a place where people go to "walk and talk, or enjoy an outdoor meal, without having to raise their voices to be heard."  Id. at 3.

At various times during the year, Church Street hosts special public events, including an annual jazz festival.  It also hosts public celebrations, such as the event in 2008 where Senator Leahy and Mayor Kiss acknowledged Church Street's recognition as one of the "10 Great Public Spaces for 2008."  Other sanctioned events in 2009 included a Farmers Market, a Fishing Derby, a Pride Parade, and a Christmas tree lighting ceremony.  (Doc. 47-1 at 1).  As explained by Deputy Mayor Costello, "[a]ll of these events obtain appropriate authorization or permits before using the designated portion of Church Street in the limited manner approved by the City."  (Doc. 48-1 at 2).

Nothing in the record suggests that it is "usual or customary" on Church Street for a citizen to suddenly raise his voice and begin preaching such that he can be heard over a football field away.  On special occasions, Church Street is host to events that are loud by nature.  However, these events are coordinated with City officials, issued permits, and required to adhere to the limitations set forth in those permits.  *Ad hoc* noise violations, such as Costello's loud preaching or the non-sanctioned "pillow fight," are prohibited.  Notably, Costello is not alleging he was improperly denied a permit, or that the standards and procedures by which the City grants permits are unconstitutional.

Costello contends that he has a right to preach "like in England or Europe, whether it be the women singing 'who will [buy] my sweet red roses,' to the peddler selling his wares [shouting] out 'pots and pans I have on hand . . . to the policeman [clanging] his bell proclaiming 'all is well.'" (Doc. 32 at 9).  He argues that these examples "and untold others proclaim it common and ordinary to say and do loud things because that is what people have always done."  Id.

Costello's comparison between modern-day Church Street and a street in old England is unavailing.  While Church Street has kiosks on the street, the record does not find

14

their vendors market their wares by shouting.  Indeed, as
described by Sergeant Lewis, "Church Street is typically quite
tranquil, devoid of traffic noise and beeping horns, and
ordinarily provides an environment where individuals can
easily converse in normal tones."  (Doc. 46-2 at 3).

Costello's situation is also distinguishable from the
fact pattern in Deegan.  There, the plaintiff was preaching on
a pedestrian mall that was similar to Church Street in several
respects.  Deegan, 444 F.3d at 137-38 (describing mall as a
pedestrian area with storefront businesses and restaurants,
and as the site of  "numerous community events" such as a
chili cook-off, a crafts show and a summer concert series).
The Second Circuit concluded that the plaintiff's
constitutional rights were violated when police "advised him
that [his] speech violated the Ithaca noise ordinance because
it could be heard from 25 feet away . . . ."  Deegan, 444 F.3d
at 138.  The facts adopted by the district court showed that

> the decibel level of speech that would comply with
> the 25 foot rule was often lower than the decibel
> level generated by the foot steps of a person in
> high heeled boots, conversation among several
> people, the opening and closing of a door, the
> sounds of a small child playing on the playground,
> or the ring of a cell phone.

Id. at 143.

Here, Costello's voice was projecting many times farther
than that of the plaintiff in Deegan.  A local merchant

complained, and the police asked Costello to lower his voice to a reasonable level.  He objected, and informed police that he would be pursuing his rights.

Taking into account the "nature and purposes of [Church Street], along with its ambient characteristics," United States v. Doe, 968 F.2d 86, 91 (D.C. Cir. 1992), the Court finds that Sergeant Lewis did not unreasonably burden Costello's protected speech.  The record shows that audible yelling at a distance of 350 feet is not in character with the usual and customary atmosphere on Church Street.  Rather, Church Street is a pedestrian thoroughfare used by the general public primarily for shopping, dining, walking and casual conversation.  Events with additional noise are permitted and sanctioned by the City on specific occasions, and these are expressly exempt from the noise ordinance.  Aside from those events, Church Street is an active yet "tranquil" place, and not somewhere that individuals are ordinarily allowed to shout in a sustained manner so that they can be heard from block to block.

In light of these facts, the Court finds that Sergeant Lewis did not burden Costello's speech to any greater extent than necessary to maintain the usual and customary decorum of Church Street.  In other words, based upon the supplemented record, the Court finds that Sergeant Lewis's actions were

narrowly-tailored to the City's significant interest in maintaining reasonable noise levels, thus satisfying the second portion of the legal standard set forth in <u>Ward</u>. 491 U.S. at 791.

C. <u>Adequate Alternatives For Expression</u>

The next stage in the analysis is whether the Burlington noise ordinance, as applied, allowed adequate alternative channels for expression. <u>Id.</u> Costello was not asked to stop preaching, but instead to lower his voice. "That the city's limitations on volume may reduce to some degree the potential audience for respondent's speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate." <u>Id.</u> at 802. Nor did Sergeant Lewis prohibit other forms of communication, such as the distribution of literature.

As the Second Circuit explained in <u>Mastrovincenzo</u>,

The requirement that "ample alternative channels" exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand; indeed, were we to interpret the requirement in this way, no alternative channels could ever be deemed "ample." <u>See</u> <u>Connection Distrib. Co. v. Reno</u>, 154 F.3d 281, 293 (6th Cir. 1998) ("[T]he requirement that ample alternative channels be left available does not mean that there must be a channel where [plaintiffs] can express themselves in precisely the same manner as before the regulation."); <u>see also</u> <u>Heffron v. Int'l Soc'y For Krishna Consciousness</u>, 452 U.S. 640, 647, 101 S. Ct. 2559, 69 L.Ed.2d 298 (1981) ("[T]he First Amendment does not guarantee the right to communicate one's views at all times and places and

17

> in any manner that may be desired."); <u>Poulos v. New
> Hampshire</u>, 345 U.S. 395, 405, 73 S. Ct. 760, 97
> L.Ed. 1105 (1953) ("The principles of the First
> Amendment are not to be treated as a promise that
> everyone with opinions or beliefs to express may
> gather around him at any public place and at any
> time a group for discussion or instruction.").

435 F.3d at 101.  Costello maintains that he had an absolute right to preach on Church Street at a volume equivalent to that used by street preachers centuries ago in Europe.  He does not contend that by lowering his voice to a reasonable level, his message would be impermissibly curtailed.  In fact, Costello had no such absolute right, and given the usual volume levels on Church Street, Sergeant Lewis's request that Costello lower his voice left Costello with adequate avenues for communication.  Lewis's conduct therefore withstands Costello's constitutional challenge.

III.  <u>Qualified Immunity</u>

Prior to Costello's appeal, Lewis moved for summary judgment solely on the basis of qualified immunity.  The Court granted the motion, finding that "Costello's right to preach at significant volumes was not clearly established," and that "it was objectively reasonable for Lewis to believe that a violation of the noise ordinance was occurring."  (Doc. 37 at 12-13).

Qualified immunity shields government officials, including law enforcement officers, "from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." McEvoy v. Spencer, 124 F.3d 92, 97 (2d Cir. 1997) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity protects government officials from lawsuits over errors made while reasonably performing their duties, whether resulting from "a mistake of law, a mistake of fact, or a mistake of mixed questions of law and fact." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

Accordingly, granting qualified immunity generally involves a two-part inquiry.  First the Court must ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled on other grounds by Pearson, 129 S. Ct. at 821.  If the plaintiff's constitutional rights were not violated then the issue of qualified immunity need not be further addressed, since "where there is no viable constitutional claim, defendants have no need of an immunity shield." Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007) (internal citations omitted).  Assuming a constitutional violation, the next question is "whether the right was clearly

19

established . . . in light of the specific context of the
case." Id. A right is "clearly established" when ignorance
of its existence would be unreasonable. Thus, if all that a
rational jury could decide is that "reasonable officers would
disagree about the legality of the defendants' conduct under
the circumstances, then qualified immunity applies and summary
judgment for the officers is appropriate." Lennon v. Miller,
66 F.3d 416, 421 (2d Cir. 1995).

In this case, for the reasons discussed above, the Court
finds that there was no First Amendment violation. As a
consequence, Lewis has no need for immunity. Even assuming a
violation, however, the Court finds that "reasonable officers
would disagree about the legality of the defendant['s] conduct
under the circumstances." Lennon, 66 F.3d 421.

"The relevant, dispositive inquiry in determining whether
a right is clearly established is whether it would be clear to
a reasonable officer that his conduct was unlawful in the
situation he confronted." Saucier, 533 U.S. at 202.

> The contours of the right must be sufficiently clear
> that a reasonable official would understand that
> what he is doing violates that right. This is not
> to say that an official action is protected by
> qualified immunity unless the very action in
> question has previously been held unlawful, but it
> is to say that in the light of pre-existing law the
> unlawfulness must be apparent.

Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citation
omitted); see also Hope v. Pelzer, 536 U.S. 730, 741 (2002)

("[T]he salient question . . . is whether the state of the law [at the time of the incidents in question] gave respondents fair warning that their alleged treatment of [the victim] was unconstitutional."). This Court must look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right. <u>Moore v. Vega</u>, 371 F.3d 110, 114 (2d Cir. 2004).

As the Second Circuit suggested in its remand order, two of the governing cases here are the Supreme Court's opinion in <u>Ward</u> and the Second Circuit's ruling in <u>Deegan</u>. While <u>Ward</u> sets forth the general standard, <u>Deegan</u> presents facts that are quite similar to those in this case. As discussed previously, however, one critical fact in <u>Deegan</u> – the volume of the speaker – was measurably different.

In <u>Deegan</u>, the Second Circuit found that the Ithaca noise ordinance had been applied unlawfully so as to prohibit "most normal human activity, including a spirited conversation by only two people." 444 F.3d at 143 (internal quotation marks omitted). In this case, Costello's voice amplified far beyond that of ordinary conversation, and dominated all noise on the street for over 100 yards. Consequently, Sergeant Lewis reasonably believed that, unlike the plaintiff in <u>Deegan</u>, Costello's shouting was unreasonable in light of the usual and

customary volumes found on Church Street, and that he needed
to lower his voice.

In sum, it was reasonable for Sergeant Lewis, a 22-year
veteran of the Burlington Police Department, to believe that
Costello's conduct was in violation of the City's ordinance.
It was also reasonable for Sergeant Lewis to request that
Costello lower his voice, and for him to believe that in doing
so he was not violating any clearly established constitutional
rights.  Thus, a rule disallowing application of Burlington's
City Ordinance to the facts of this case would not be "clearly
established," and Sergeant Lewis would be entitled to
qualified immunity even assuming a constitutional violation.

### Conclusion

For the reasons set forth above, defendant John Lewis's
motion for summary judgment (Doc. 25) is GRANTED.  For the
reasons set forth in the Court's prior Opinion and Order (Doc.
37), the motion to dismiss filed by defendants City of
Burlington, Burlington Police Department, Gene Burgman, Tom
Trembly and Bill Ward (Doc. 16) is GRANTED, and this case is
DISMISSED.

As the Second Circuit has instructed, "[a]fter the
District Court's decision, jurisdiction may be restored to
[the Second Circuit] by letter from any party, and the Clerk's
Office shall set a briefing schedule and send such proceeding

to this panel for disposition without oral argument unless otherwise ordered." (Doc. 44 at 3-4).

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 26th day of March, 2010.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
Senior United States District Judge